IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| DAWN V.L.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 5:21-cv-00052 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| COMMISSIONER OF | ) | By:    Joel C. Hoppe |
| SOCIAL SECURITY, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Dawn V. L. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying her application for disability insurance benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me

by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the

parties' briefs, and the applicable law, I cannot find that the Commissioner's denial of benefits is

supported by substantial evidence. Accordingly, I respectfully recommend that the presiding

District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C.

§ 405(g).

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[2] Social Security ALJs follow a five-step process to determine whether a

---

[2] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Dawn applied for DIB in March 2019. *See* Administrative Record ("R.") 15, 179–185, ECF No. 14. She alleged that she became disabled on September 15, 2016, because of post-traumatic stress disorder ("PTSD"), chronic pain from severe burns over 60% of her body, addiction issues, obsessive compulsive disorder ("OCD"), underactive thyroid condition, chronic obstructive pulmonary disease ("COPD"), medullary sponge kidney, constipation issues, fibromyalgia, severe nerve damage from burns, anxiety and depression, and borderline multiple personality disorder. R. 209. Dawn was forty-five years old, or a "younger person" under the regulations, on her alleged onset date. R. 63, 217; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied Dawn's claim initially in June 2019, R. 63–73, and upon reconsideration in August 2019, R. 74–82. In August 2020, Dawn appeared with counsel by telephone at an administrative hearing before ALJ Donna M. Edwards. R. 31–62. Dawn testified, R. 35–51, as did a vocational expert ("VE"), R. 51–61.

ALJ Edwards issued an unfavorable decision on September 16, 2020. R. 15–25. She found that Dawn had not worked since September 15, 2016, her alleged onset date, and that she

met the Act's insured-status requirements through September 30, 2018.[3] R. 17. Dawn had the

following "severe" medically determinable impairments ("MDI") during the relevant two-year

period: COPD, neuropathy (status post burns), PTSD, anxiety disorder, adjustment disorder,

depressive disorder, panic disorder, and seizure disorder. R. 18. ALJ Edwards also discussed

Dawn's gastroesophageal disease ("GERD") and hypothyroidism and found them to be non-

severe. *Id.* None of Dawn's severe impairments or combination of impairments met or medically

equaled the severity of any Listing. R. 19–20 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 3.02,

11.02, 11.14, 12.04, 12.06, 12.15). As part of her Listings analysis, ALJ Edwards found that

Dawn's severe depression, anxiety, and PTSD caused "moderate" overall limitations in

understanding, remembering, or applying information; interacting with others; concentrating,

persisting, or maintaining pace; and adapting or managing herself. R. 20.

ALJ Edwards then evaluated Dawn's residual functional capacity ("RFC") during the

relevant period and found that she could perform "light work"[4] with additional limitations:

> she could climb ramps and stairs occasionally but could never climb ropes, ladders,
> and scaffolds. She could never crawl but occasionally could balance, stoop, kneel,
> and crouch. She must avoid all exposure to unprotected heights, moving machinery,
> open flames, and open bodies of water. She could never operate a motor vehicle.
> She must avoid concentrated exposure to wetness, humidity, dust, fumes, gas, and
> pulmonary irritants. She could understand, remember, and carry out simple
> instructions and could perform simple, repetitive, and routine tasks. She could
> tolerate occasional change in the workplace and have occasional, superficial

---

[3] The latter date is called the date last insured, or "DLI." *See Bird v. Comm'r of Soc. Sec. Admin.*, 699
F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Dawn] must prove that she became disabled prior to
the expiration of her insured status." *Johnson*, 434 F.3d at 655–56. The ALJ was required to consider
Dawn's "complete medical history," 20 C.F.R. § 404.1512(d)(2), including any relevant evidence created
after her DLI that suggested some link between her "post-DLI state of health and her pre-DLI condition,"
*Bird*, 699 F.3d at 341.

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these strength
demands can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to
six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'"
*Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20
C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

interaction with the public, supervisors, and coworkers. She would be unable to
perform at production rate pace (assembly line and quota work) but could perform
goal-oriented work.

R. 20 (punctuation corrected). This RFC ruled out Dawn returning to her past relevant work as a

parts assembler. R. 23 (citing R. 52–53). Based on her RFC finding and the VE's testimony, ALJ

Edwards found that Dawn still could have performed certain "light" occupations, specifically,

price marker, sorter, and laundry bagger, that offered a significant number of jobs in the national

economy. R. 23–24 (citing R. 52–53). Thus, she concluded that Dawn was not disabled from

September 15, 2016, through September 30, 2018. R. 24–25. The Appeals Council declined to

review that decision, R. 1–3, and this appeal followed.

### III. Discussion

Dawn challenges the Commissioner's denial of benefits on the grounds that ALJ Edwards

"failed to properly consider the medical source opinion from nurse practitioner ('NP') Andrew

Catalone." Pl.'s Br. 5 (citing R. 22, 900–04), ECF No. 21. First, she argues that ALJ Edwards

erred in finding that NP Catalone was not an "acceptable medical source" under the regulations.

*Id.* at 7–8 (citing R. 22; 20 C.F.R. § 404.1502(a)(7)). Second, she contends that ALJ Edwards did

not properly consider the supportability and consistency factors in accordance with 20 C.F.R. §

404.1520c when evaluating NP Catalone's "very limiting" medical opinion. *See id.* at 8–9.

Finally, Dawn argues that ALJ Edwards's discussion of certain relevant evidence was "incorrect

or legally erroneous." *Id.* at 9–10 (citing R. 21–23).

A.    *Summary*

1.    *Treatment Records*

From October 2016 to May 2019, Dawn sought treatment from East Hill Family Medical.

R. 412–46. Most treatment was related to Dawn's physical ailments (COPD, Neuralgia, tobacco

use, hypothyroidism, and GERD). R. 412. At an appointment in October 2016, Dawn presented

5

with "anxiety and [] depression," *id.*, but Kimberly Shadle, LPN, found that both were stable, R. 415. Her physical exam results showed normal affect, coordination, and thought processes. R. 415; *see also* R. 422, 426, 431, 435, 438, 444. At a follow-up visit in January 2018, Dawn reported "panic attacks" in large crowds, and discussed her PTSD and trauma from the fire she was in a few years prior. R. 420–21. Otherwise, she "denie[d] depression and sleep pattern disturbance." R. 421; *see also* R. 425. In May 2018, Dawn reported feeling "depressed," and was "positive" on a depression screening result. R. 429. LPN Shadle noted that Dawn reported compliance "with mental health" treatment, which she received from other providers, and was "having a lot of mid life issues." *Id.*

From 2016 to 2019, Dawn sought treatment at the Cayuga County Community Mental Health Center ("CCMH"). R. 905–1107. In November 2016, she consulted with provider David Kegley, LMSW, for a crisis session and reported "significant anxiety and depressive symptoms." R. 916. She reported that she had been severely burned three years prior and that she suffered from PTSD. *Id.* Dawn reported an "increase in suicidal ideation ([n]o plan or intent), secondary to anxiety and depression exasperated by nerve damage and increased psychostressors." *Id.* She was taking Celexa "without any noticeable relief." *Id.* On her risk assessment, Dawn indicated that she "wished [she] [was] dead or wished [she] could go to sleep and not wake up," but had not had actual thoughts of killing herself. *Id.*; *see also* R. 919. At a follow-up screening, Dawn presented with "classic" symptoms of anxiety. R. 918. She said her symptoms affected her functioning and her employer had given her a leave of absence to manage her mood after she snapped at a coworker. *Id.* She had chronic pain from second- and third-degree burns on most of her body that she sustained when "she caught on fire" while her husband was making methamphetamine. *Id.* Dawn was taking Celexa, Trazadone, Levothyroxine, Flexeril, and

6

Gabapentin. *Id.* On mental status exam, Kerrie Catalino-Carranti, LMSW, found that Dawn was oriented and alert, her mood was irritable, her memory was not impaired, her thought content had no significant preoccupations, her attitude was dramatic, her judgment was fair, and she appeared able to maintain focus. R. 921–22. Ms. Catalino-Carranti recommended that Dawn "would benefit from individual psychotherapy sessions [every two weeks] and medication evaluation in order to address symptoms of anxiety, . . . depression, . . . aggressive behavior, anger and post traumatic stress . . . " symptoms. R. 922; *see also* R. 929, 943, 948, 963, 969 (continuing similar treatment planning at following appointments).

On March 6, 2017, Dawn did not return to treatment and was discharged with "no improvement." R. 310. Dawn returned to CCMH on March 22 after obtaining "the funding available through DDS to pay for services." R. 315. She resumed therapy sessions for anxiety, anger management, and PTSD, and she was diagnosed with adjustment disorder with anxiety. R. 319. Dawn attended four sessions in March and April, but she missed several sessions in May and June and was discharged from services. R. 328.[5]

On May 9, 2018, Dawn returned to CCMH. R. 333. She had relapsed on heroin, and she was planning to switch substance abuse therapy from Confidential Help for Alcohol & Drugs ("CHAD") to Syracuse Recovery Systems ("SRS"). In August 2018, Dawn was "tearful and sad and angry in session." R. 989. She was "not sleeping or leaving the house," and she was "fearful of being targeted by people in the community." *Id.* Dawn had not been taking Xanax "for the past 9 months because she had to choose between" that drug or taking Suboxone, and she felt

[5] Throughout her treatment at Cayuga Community Mental Health Center, Dawn attended dozens of sessions, but she also missed many appointments. *See, e.g.*, R. 924–25, 930–31, 932–33, 956, 957, 958, 974, 975, 1038, 1011, 1024, 1031, 1063, 1081, 1083, 1084. Dawn missed some of these appointments for no provided reason, *see, e.g.*, R. 957, 958, 1038, but other times she cancelled in advance and provided a reason to the health center, *see, e.g.*, R. 924–25 (court date regarding custody issue), 930–31 (could not pay copay), 956 (surgery recovery).

7

that Suboxone was "saving" her at that time. R. 989. At the next follow-up appointment, Dawn admitted to a "poor choice" regarding her Suboxone program. R. 997. As a result, she had weekly appointments to take her Suboxone in front of providers. *Id.* Dawn was discharged from SRS in the fall of 2018. R. 1009. At a follow-up in October 2018, Dawn's provider recommended "6 weeks of weekly sessions to focus on trauma," also in addition to attending CHAD and NP Catalone's medication management appointments. R. 1029–30. In November, Dawn experienced a traumatic event from seeing her husband overdose on heroin. R. 1049. "She admitted that she ha[d] been having triggers and cravings to use" drugs, but she attended CHAD and "was able to process and review [a] safety plan." R. 1050. Dawn also planned to talk to NP Catalone about "giving her a breakthrough dose of [Suboxone] during the night so she [does not] relapse." *Id.* At her next session, Dawn and her therapist planned to "work on anger as well as trauma," R. 1056, in response to Dawn discussing her anger issues during that appointment, R. 1055. Dawn was discharged from CCMH in March 2019 because she was moving out of the county. R. 357. Her discharge condition showed "some improvement." *id.*

From January 2017 to February 2019, Dawn attended intensive outpatient group therapy and individual counseling sessions at CHAD to address her opiate dependence. R. 365–98. Dawn was prescribed a Suboxone program, and the amount was increased to address Dawn's struggles with addiction. R. 372, 374, 376, 378. In June 2018, Dawn was prescribed opiates after surgery, and she relapsed. R. 382. She "began to abuse [the prescription opiates] and get opiates and heroin." *Id.* Dawn was discharged from the program, and her "prognosis [was] poor at this time . . ." *Id.*

From May to September 2018, Dawn participated in group and individual substance abuse therapy at Syracuse Recovery Services ("SRS"). R. 303–05. CHAD transferred her

Suboxone care to SRS. R. 303. Dawn reported "abstinence since 7/6/18 as verified by negative urine drug screens aside from prescribed Suboxone." *Id.* After attending approximately eighty therapy sessions, Dawn was discharged for non-compliance with program rules because she was seeking Suboxone from NP Catalone "without notifying SRS of plans to transfer" care to another clinic. R. 303–04.

After beginning treatment, including Suboxone therapy, with NP Catalone, Dawn returned to CHAD in September 2018. R. 385. She reengaged with group therapy, and she reported attending mental health counseling. R. 389. She was discharged after completing her treatment in February 2019, and staff concluded Dawn met all her goals. R. 391. "Dawn was able to maintain abstinence from all mood altering chemicals as evidence by negative drug screens," and her "prognosis [was] good . . . ." R. 394.

From September 17, 2018, to October 14, 2019, Dawn saw NP Catalone at least once a week for therapy and medication management. *See generally* R. 487–826. At her first appointment, Dawn reported having opioid dependence since 2012. R. 818. She also reported having chronic pain, joint and muscle pain, depression, difficulty concentrating, anxiety, stress, and nightmares. R. 819. They also discussed her "PTSD from sexual abuse and trauma." R. 823. On examination, NP Catalone observed that Dawn's mood was sad, depressed, and anxious, and her affect was fearful/anxious and sad/depressed. *Id.* He diagnosed Dawn with "severe" opioid use disorder and chronic pain syndrome, R. 825, and prescribed Suboxone and psychotherapy, R. 825–26. NP Catalone noted the same examination findings at follow-up appointments. *See, e.g.*, R. 805–06, 812–13. He noted that Dawn was prescribed Neurontin and Lyrica. R. 811. At an appointment in October 2018, Dawn stated that "[s]he went to the ER with chest pain which was [diagnosed] as anxiety," and she reported "doing well" on suboxone. R. 798. Dawn was

attending substance dependence counseling at CHAD and mental health therapy at CCMH. *Id.*

Dawn's symptoms and NP Catalone's exam findings were the same. R. 799–800. NP Catalone

noted that Dawn had a diagnosis of fibromyalgia. R. 801. At later appointments, NP Catalone

adjusted Dawn's Suboxone prescription, R. 756, and he noted that several medications, including

Lyrica, Cymbalta, and Neurontin, had failed, R. 756, 791. In February 2019, NP Catalone noted

additional diagnoses of PTSD, generalized anxiety disorder, panic disorder, and major depressive

disorder. R. 668. Over the course of NP Catalone's treatment, his exam findings were similar,

although at different times he added that Dawn's speech was rapid and pressured; her thought

content showed poor confidence/esteem and poor body image; she had elevated psychomotor

activity; her mood was irritable; and her affect showed anger/rage, embarrassment/shame, and

guilt. *See, e.g.*, R. 610, 618, 626, 642, 666, 716, 722, 730, 737, 743–44, 750, 757–58, 771.

Dawn's symptoms, including chronic pain and anxiety, continued. NP Catalone occasionally

adjusted Dawn's medications, but her treatment plan remained constant. R. 761–62; *see, e.g.*, R.

535, 714–15, 721, 728, 735, 742, 751, 754 (indicating that Dawn continued to take suboxone and

was doing well); *see generally* R. 487–668.

## 2.    *Medical Opinions*

T. Schmidt-Deyoung, M.D., and H. Ferrin, Ph.D., reviewed Dawn's records for DDS in

June 2019. *See* R. 63–72. They opined that Dawn's anxiety and depression were both "non-

severe" medical impairments because the file lacked "clinical evidence." R. 68–69. At the

reconsideration level, Dawn provided information of a change in her condition that she had

"chronic pain in lower back and legs," and she "ha[d] to use a cane for support to walk." R. 75.

V. Cincore, M.D., and M. Tatar, Ph.D., found that Dawn's thyroid gland disorder, burns not

otherwise specified, chronic respiratory disorders, anxiety and OCD, and depression, bipolar, and

10

related disorders, were all "severe" medical impairments. R. 80. They deemed that there was

"insufficient evidence to evaluate the claim" through Dawn's DLI and therefore "[n]o

RFC/MRFC assessments [were] associated with this claim." *See* R. 79–80.

 NP Catalone completed a medical source statement in July 2020. R. 900–04 (Ex. B17F).

He noted that he started seeing Dawn on September 10, 2018, and that she had diagnoses

including opioid use, anxiety disorder, PTSD, depression, "panic," and chronic pain, all with

"ongoing symptoms." R. 900. He identified the signs and symptoms of Dawn's impairments,

which included feelings of guilt or worthlessness; generalized persistent anxiety; mood

disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a

traumatic experience, which are a source of marked distress; change in personality; impulsive

and damaging behavior; impairment in impulse control; emotional lability; deeply ingrained,

maladaptive patterns of behavior; persistent disturbances of mood or affect; and recurrent severe

panic attacks. *Id.*

 Next, NP Catalone evaluated Dawn's "ability to do work-related activities on a day-to-

day basis in a regular work setting," which fell into three degrees of limitation: (1) "Limited but

satisfactory"; (2) "[s]eriously limited by not precluded means [the] ability to function in this area

is seriously limited and less than satisfactory, but not precluded in all circumstances"; and (3)

"[u]nable to meet competitive standards means your patient cannot satisfactorily perform this

activity independently, appropriately, effectively and on a sustained basis in a regular work

setting." R. 901. "[B]ased on [his] examination" findings and familiarly with Dawn's medical

history, NP Catalone opined that Dawn was "limited but satisfactory" in her abilities to interact

appropriately with the general public, maintain socially appropriate behavior, and adhere to basic

standards of neatness and cleanliness. *Id.* She was "seriously limited, but not precluded" in her

abilities to remember work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention for two-hour segments; maintain regular attendance and be punctual within customary usually strict tolerances; sustain an ordinary routine without special supervision; ask simple questions or request assistance; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; travel in unfamiliar places; and use public transportation. *Id.* Lastly, she was "unable to meet competitive standards" in her abilities to work in coordination or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and be aware of normal hazards and take appropriate precautions. *Id.* NP Catalone explained that Dawn was "able to function in [a] work setting but limited." *Id.* Dawn had "somewhat" "low IQ or reduced intellectual functioning" and her "ongoing opioid dependence medication," Suboxone, would impact her "ability to function on a daily basis and in a competitive work environment." R. 902. Dawn had "repeated episodes of deterioration or decompensation in work or work-like settings," which would cause her to "withdraw from the situation or experience exacerbation of signs and symptoms[.]" *Id.* Dawn "sometimes" had "deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner[.]" *Id.* She would be off task for 10% of an 8-hour workday and would be absent "[a]bout one day per month" on average, and she "may experience on/off days" that would "affect [her] ability to work at a regular job on a sustained basis." *Id.* NP Catalone opined that Dawn's impairment-related functional limitations, "as outlined in []his Medical Source Statement," had "existed and persisted to the same degree

since at least January 1, 2016[.]" R. 903. Finally, he determined that Dawn's "current physical and mental limitations [would] remain if [] [she] stopped using drugs and/or alcohol[,]" but he also wrote as an explanation, "Is drug related." R. 904.

On June 22, 2020, Dawn's primary care provider, Meenu Gopal, M.D., completed a medical source statement. R. 894–99. Dr. Gopal reported that she had treated Dawn since January 8, 2020. R. 894. Dawn had diagnoses of hypothyroidism, neuropathy pain, COPD, opioid dependence, and PTSD. *Id.* Dr. Gopal opined that Dawn's conditions "will not likely improve," and her "neuropathy will worsen as the condition progresses." *Id.* Dawn could sit and stand or walk for less than two hours in an eight-hour day, she would need to shift positions at will, and she would need to take unscheduled breaks. *Id.* Dawn could lift up to ten pounds frequently and up to twenty pounds occasionally. R. 895. Dawn was "seriously limited by but not precluded" in remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; making simple work-related decisions; dealing with normal work stress; and being aware of normal hazards and taking appropriate precautions. R. 897. She was "unable to meet competitive standards" in maintaining attention for two-hour segments and sustaining an ordinary routine without special supervision. *Id.* She had "no useful ability to function" in maintaining regular attendance and being punctual within customary, usually strict tolerances; working in coordination with or proximity to others without being unduly distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. *Id.* Additionally, Dawn would be off-task more than 20% of a normal workday, and she would be absent from work as a result of her impairments or treatment more than four days a month. R. 897–98. Dr. Gopal noted that Dawn was taking Suboxone for opiate dependence that

was in remission, and she opined that Dawn's physical and mental limitations would persist if she stopped using substances. R. 896. Dr. Gopal attributed Dawn's limitations to her chronic pain, COPD, PTSD, and anxiety. R. 897–99. Lastly, Dr. Gopal opined that Dawn's limitations had "existed and persisted to the same degree since at least January 1, 2016." R. 899.

Dr. Gopal also provided a "summary statement" letter in August 2020. R. 1717 (Ex. B21F). Dawn had been Dr. Gopal's patient for one year, and she saw "her for wellness checks and management of multiple chronic issues." *Id.* Dr. Gopal made "[s]pecial note" of "Dawn's compliance with treatment protocols and unusual tenacity/fortitude in coping with medical difficulties." *Id.* She found that "Dawn's functional capacity ha[d] been severely limited following" her burn injury, and as a result, she suffered with "severe neuropathy pain and [PTSD] that prevent[ed] her from gainful employment." *Id.* Dr. Gopal concluded that Dawn's condition was unlikely to improve. *Id.* She also noted that "Dawn ha[d] other co-morbidities that also worsen[ed] her disability." *Id.* Dr. Gopal reported that "Dawn's physical mobility [was] restricted more than 70%," and "[s]he [was] unable to lift more than 10 pounds, reach, push, and pull . . . ." *Id.* Dawn's severe neuropathic pain resulted in "sleep deprivation, lack of concentration, and increasing depression/loss of hope." *Id.*

    *3.    Subjective Statements*

On August 4, 2020, Dawn testified at an administrative hearing. R. 31–62. Dawn suffered burns in a house fire in 2012. R. 40. The burns covered over "60 percent of [her] body," and were "second and third degree." *Id.* She took pain medication for the "neuropathy of the burn," which caused a "burning" sensation and felt like "worms under [her] skin." R. 41. Dawn could sit "[a]bout five minutes" without "being uncomfortable or having to move around." R. 42. She could lift "maybe five pounds." R. 43. Her COPD made it so she "can't walk very far without

gasping for air." R. 44. Her "feet and [] hands swell up all the time, [so] [she] ha[s] to sit with [her] feet up a lot." R. 45. She had "medullary sponge kidney," which caused painful kidney stones, and her fibromyalgia caused pain in her finger joints. R. 46.

Dawn had PTSD "from the fire," R. 47, and it "physically hurt[ for her] to talk about it," because she "[did not] want to go back there," R. 48. She received mental health medications through Dr. Gopal, her primary care physician, because she recently had moved to Virginia and was "not able to get into the mental health place yet," because of the coronavirus pandemic. R. 47–48. She planned to seek more specialized mental health treatment. R. 49.

On a typical day, Dawn cried a lot because she was "always overwhelmed and in pain with everything." *Id*. She tried to do "as much as [she] [could]," such as cleaning "a little bit," and taking a shower. *Id.* She cooked "a little bit," usually twice a week, and her husband did most of the shopping. R. 50. Dawn did not "like to leave the house unless [she] [had] to go see the doctor. It [was] the only time [she] [was] comfortable." *Id.* Dawn also described being "afraid of people," and having trouble interacting with people. *Id.* She had uncontrollable "outbursts," one of which resulted in her being fired from her last job. *Id.* ("I was screaming at my coworkers and they told me I couldn't be there anymore."). Dawn's physical and mental conditions had persisted "ever since the fire," which was "when everything got bad." *Id.* Finally, regarding her substance abuse, Dawn stated that she had been sober since 2012, used only prescribed medications, and did not drink or use any recreational drugs. R. 50–51.

B.    *The ALJ's Decision*

ALJ Edwards summarized some of this evidence in her written decision. *See* R. 15–25. At step two, she found that Dawn had the following severe MDIs during the relevant two-year period: COPD, neuropathy (status post burns), PTSD, anxiety disorder, adjustment disorder,

depressive disorder, panic disorder, and seizure disorder. R. 18. ALJ Edwards found that these

were "severe" MDIs because they "significantly limit[ed] [Dawn's] ability to perform basic work

activities." *Id.*

Discussing the Listings for Dawn's mental impairments, the ALJ found that Dawn had

moderate limitations in understanding, remembering, or applying information; interacting with

others; concentrating, persisting, or maintaining pace; and adapting or managing herself. R. 19–

20. Regarding Dawn's mental RFC, ALJ Edwards concluded that Dawn "could understand,

remember[,] and carry out simple instructions, and could perform simple, repetitive[,] and

routine tasks." *Id.* "She could tolerate occasional change in the workplace and have occasional,

superficial interaction with the public supervisors, and coworkers." *Id.* She "would be unable to

perform at a production rate pace . . . but could perform goal oriented work." *Id.*

As part of her RFC analysis, ALJ Edwards found that Dawn's MDIs "could reasonably

be expected to cause [her] alleged symptoms," but her "statements concerning the intensity,

persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the

medical evidence and other evidence in the record for the reasons explained" elsewhere in her

decision. R. 21. First, ALJ Edwards discussed the nature of Dawn's treatment, finding that she

"has not generally received the type of medical treatment one would expect for a disabled

individual." R. 22. She explained that Dawn was not currently in any mental health treatment and

that her previous treatment had "been sporadic, with gaps in treatment and no-shows for

scheduled appointments." *Id.* (citing R. 310–62, 916–1103). ALJ Edwards also found that Dawn

took "multiple medications and the medical records reveal they have been relatively effective in

controlling her symptoms." *Id.* ALJ Edwards found an inconsistency between Dawn's testimony

that she had been sober since 2012, and her treatment from SRS in 2018 and her report to SRS of

sobriety since July 6, 2018. *Id.* (citing R. 50–51, 303). Lastly, ALJ Edwards cited Dawn's

activities that "she shower[ed] daily, [did] some cleaning, and [went] to medical appointments,"

to support her conclusion that Dawn had "described daily activities that [were] not limited to the

extent one would expect, given the complaints of disabling symptoms and limitations." *Id.*

Next, ALJ Edwards evaluated the medical-opinion evidence in Dawn's record. *See* R.

22–23. She found NP Catalone's opinion to be "unpersuasive" because, although his opinion

"cover[ed] a period that beg[an] prior to [Dawn's] date last insured," NP Catalone was "not an

acceptable source to make a diagnosis, which he did," and "his opinion lack[ed] explanation and

[was] without support in the medical evidence of the record." R. 22.ALJ Edwards did not cite

any specific medical evidence that undermined NP Catalone's assessment of Dawn's

impairment-related limitations. *See id.* Regarding Dr. Gopal's medical source statement dated

June 22, 2020, ALJ Edwards found the opinion "irrelevant to the adjudicative period" because it

showed Dawn established care with Dr. Gopal in January 2020, "well after [her] date last

insured." *Id.* (citing Ex. B16F) ("A medical source statement from Dr. Gopal . . . , dated June 22,

2020, shows the claimant established care on January 8, 2020. This is well after the claimant's

date last insured and renders the opinion irrelevant to the adjudicative period."). *But see* R. 899

(Dr. Gopal's opinion that Dawn's functional limitations, "as outlined in this [MSS], existed and

persisted to the same degree since at least since January 1, 2016"). ALJ Edwards rejected Dr.

Gopal's opinion letter from August 2020 because it addressed matters reserved to the

Commissioner, it did not identify objective evidence to support the conclusions, and "[m]ost

importantly," Dr. Gopal began treating Dawn well after her date last insured, which render[ed]

the opinion irrelevant to the adjudicative period." R. 23. Lastly, regarding the DDS opinions that

Dawn's then-available treatment records were "insufficient" to evaluate her claim, ALJ Edwards

found "that there no[w] exist[ed] sufficient medical evidence of record to evaluate the claim." *Id.* (citing R. 63–75, 74–81).

C.    *Discussion*

Dawn challenges ALJ Edwards's mental RFC findings. A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities" on that basis, SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

Dawn contends that the ALJ's RFC determination is flawed because she failed to properly consider NP Catalone's medical opinion. "Medical opinions"—i.e., "statement[s] from a medical source about what [the claimant] can still do despite" her MDIs and whether she has "impairment-related limitations or restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R. § 404.1513(a)(2), can be critical to a proper RFC analysis. *See, e.g.*, *Woods v. Berryhill*, 886 F.3d 686, 695 (4th Cir. 2018). For DIB claims filed after March 27, 2017, ALJs must "articulate in [the] . . . decision how persuasive [they] find all of the medical opinions" in the claimant's record to be, 20 C.F.R. § 404.1520c(b), using the relevant factors listed in the regulations, "as appropriate," *id.* § 404.1520c(a).

"[S]upportability and consistency are the most important factors [ALJs] consider when [they] determine how persuasive [they find] a medical source's medical opinion . . . to be." 20

C.F.R. § 404.1520c(b)(2) (cleaned up). ALJs therefore "will explain how [they] considered"

those two factors when evaluating a medical source's medical opinion. *Id.* "Supportability" looks

at the "objective medical evidence and supporting explanations presented by a medical source . .

. to support his or her [own] medical opinion(s)[.]" *See id.* § 404.1520c(c)(1). The "more

relevant" the evidence and explanations "presented by a medical source are to support his or her

medical opinion(s), the more persuasive" those opinions will be. *Id.* "Consistency," on the other

hand, compares the medical opinion to other relevant evidence in the claimant's record. *See id.* §

404.1520c(c)(2). "The more consistent a medical opinion(s) . . . is with the evidence from other

medical sources and nonmedical sources in the [record], the more persuasive the medical

opinion(s) . . . will be." *Id.* ALJs "may, but [generally] are not required to, explain how [they]

considered" other regulatory factors, *id.*, such as the source's medical specialty, familiarity with

the record, or treating relationship with the claimant. *See id.* § 404.1520c(b)(3).

This regulation is more flexible than its prior version, which required ALJs to evaluate

"treating source" medical opinions under a special standard and to explicitly consider each of

five regulatory factors when assigning specific weights to every medical opinion in the

claimant's record. *See, e.g.*, *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 384–85 (4th Cir.

2021) (citing 20 C.F.R. § 404.1527(c) (2016)); *Testamark v. Berryhill*, 736 F. App'x 395, 398

(4th Cir. 2018) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c) (2016)); 20 C.F.R. § 404.1520c(a)

(2017) ("We will not defer or give any specific evidentiary weight, including controlling weight,

to any medical opinion(s) . . . including those from your medical sources."). The new regulation

also expanded the phrase "acceptable medical source" to include "licensed advanced practices

nurse[s]" who offer medical opinions on the claimant's "impairments within his or her licensed

scope of practice," 20 C.F.R. § 404.1502(a)(7), and recognized that those sources can have a

"treating" relationship with the claimant, *see id.* § 404.1520c(a), (b)(3). Even under the new

regulation, an ALJ "cannot reject an examining or treating [source's] opinion as unsupported or

inconsistent without providing an explanation supported by substantial evidence." *Woods v.

Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

Fundamental principles of judicial review also still apply. "[A] proper RFC analysis," for

example, "has three components: (1) evidence, (2) logical explanation, and (3) conclusion."

*Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). "The second component, the ALJ's

logical explanation" of how she weighed relevant evidence, such as medical opinions, and

arrived at her RFC findings, "is just as important as the other two." *Id.* "This requires the ALJ to

'present [the court] with findings and determinations sufficiently articulated to permit

meaningful judicial review.'" *Testamark*, 726 F. App'x at 399 (quoting *DeLoatche v. Heckler*,

715 F.2d 148, 150 (4th Cir. 1983)). When the court is "'left to guess' as to how the ALJ reached

her evaluation of the conflicting medical opinions in light of the evidence of record," then it

cannot "review the reasonableness of her conclusions," *id.* (quoting *Mascio*, 780 F.3d at 638), to

ensure "the ALJ's decision is supported as a matter of fact and law," *Keene v. Berryhill*, 732 F.

App'x 174, 177 (4th Cir. 2018). *See, e.g.*, *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95

(4th Cir. 2020) ("[E]ven under this deferential standard, we do not reflexively rubber-stamp an

ALJ's findings. To pass muster, ALJs must build an accurate and logical bridge from the

evidence to their conclusions." (cleaned up)).

ALJ Edwards's decision does not satisfy this "deferential standard of review," *Dunn v.

Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015). At the outset, ALJ Edwards erred in finding that

NP Catalone was "not an acceptable source to make a diagnosis," R. 22, under the revised

regulations. For claims filed after March 27, 2017, an acceptable medical source includes

"licensed advance practice registered nurses or other licensed advance practice nurses with another title, for impairments within his or her scope of practice." 20 C.F.R. § 404.1502(a)(7). The Commissioner properly concedes that the ALJ erred on this point. Def.'s Br. 10, ECF No. 23. Moreover, NP Catalone's purported lack of qualification "to make a diagnosis," R. 22, was not relevant to the ALJ's analysis because ALJ Edwards had already found that Dawn's diagnosed PTSD, anxiety disorder, depressive disorder, and panic disorder were "severe" medically determinable impairments during the relevant time, R. 18; *see* R. 900.

Second, ALJ Edwards did not "articulate *how* [she] considered the supportability and inconsistency factors," *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (Jan. 18, 2017) (emphasis added) ("*Revisions to Rules*"), in finding that NP Catalone's opinion was unpersuasive, R. 22. She simply concluded:

> The opinion is unpersuasive. While it covers a period that begins prior to the claimant's date last insured, . . . his opinion lacks explanation and is without support in the medical evidence of record. Further, Nurse Catalone indicated that the claimant's mental limitations would persist absent substance use but then states the limitations are "drug related."

R. 22. ALJ Edwards did not mention the consistency factor at all and, as to the supportability factor, the ALJ merely concluded without analysis that NP Catalone's opinion "lacks explanation and is without support in the medical evidence of record." *Id.* This failure to explain is reversible legal error. *See Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *1 (E.D. Mich. Aug. 13, 2021); *cf. Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 661 (4th Cir. 2017) (concluding that a regulation which "states the SSA *will* document application of the [special] technique in the decision" imposed mandatory duty of written explanation in evaluating mental impairments and explaining that an ALJ's "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review"); *Monroe v. Colvin*, 826 F.3d 176, 191 (4th Cir. 2016)

(ALJ's conclusory statement that "the objective evidence or the claimant's treatment history did not support the consultative examiner's findings," without specific citations to the record, precluded meaningful review).

The ALJ's failure to explain her determination that NP Catalone's opinion lacks support is especially troubling because the record, including more than three hundred pages of treatment notes from NP Catalone, provide considerable support for his opinion. The medical source statement form indicated that NP Catalone's "opinion [was] based on [his] examination of how [his] patient's mental/emotional capabilities are affected by the impairments," and he cited more than a dozen signs and symptoms that Dawn exhibited. R. 900–01. NP Catalone conducted a detailed mental examination at each of Dawn's many appointments. He observed signs of depression, anxiety, sadness, fear, anger, irritability, poor confidence, elevated psychomotor activity, and rapid and pressured speech. Dawn discussed her chronic pain and anxiety, and NP Catalone noted diagnoses of "severe" opioid use disorder, chronic pain syndrome, PTSD, generalized anxiety disorder, panic disorder, and major depressive disorder. Furthermore, NP Catalone's observations are supported by other providers' treatment records. Treatment notes from CCMH documented Dawn's anxiety, chronic pain from her burns, and her PTSD from the burns and sexual abuse. The ALJ did not explain why this considerable evidence did not support NP Catalone's opinion, nor did the ALJ cite any part of the medical record that contradicted NP Catalone's opinion. *See Woods*, 888 F.3d at 694 (An ALJ "must *both* identify evidence that supports [her] conclusion *and* build an accurate and logical bridge from that evidence to [her] conclusion.").

The ALJ's final reason for discrediting NP Catalone's opinion also does not withstand scrutiny. The ALJ found that NP Catalone's opinion "indicated that the claimant's mental

limitations would persist absent substance use but then states the limitations are 'drug related.'" R. 22 (quoting R. 904). The ALJ did not explain why she found NP Catalone's statement problematic, which complicates the Court's review of her reasoning. In any event, the Court sees no inconsistency in that portion of NP Catalone's opinion. *See Hines*, 453 F.3d at 565 (ALJ's conclusion that claimant's testimony describing functional limitations was inconsistent with his testimony about his daily activities "was not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two").  For most of NP Catalone's treatment, Dawn was in recovery from substance use, but NP Catalone nonetheless observed many abnormal signs on examinations. At the beginning of his opinion, NP Catalone noted that Dawn had "ongoing symptoms" and he listed diagnoses of opioid use, anxiety disorder, PTSD, depression, panic, fibromyalgia, asthma, and chronic pain. R. 900. The ALJ found many of those impairments to be severe, so it is unclear why the ALJ doubted that they may cause limitations. Afterall, a claimant's symptoms and limitations may be caused by one or multiple mental impairments, including a substance disorder. Dawn's limitations may be "drug related," and persist absent drug use. Accordingly, I find that the ALJ's analysis of NP Catalone's medical opinion is not supported by substantial evidence.

Dawn also disagrees with ALJ Edwards's summary of the other evidence in the record, contending that "much of this discussion is either incorrect or legally erroneous." Pl.'s Br. 9. Although ALJ Edwards did not explicitly cite this evidence to support her finding that NP Catalone's opinion was "unpersuasive." Dawn's argument seems to take issue with the ALJ's conclusion that her statements "concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" R. 21. The Court addresses this argument briefly to provide guidance on remand.

The ALJ identified five reasons to question the severity of Dawn's symptoms: her daily activities, her treatment regimen, her noncompliance with treatment, her medications which were "relatively effective" in controlling her symptoms, and her inconsistent statements about her sobriety. R. 22. An ALJ evaluating the claimant's RFC has broad discretion to decide whether an alleged symptom or limitation is supported by or consistent with other relevant evidence in a claimant's record. *See Hines*, 453 F.3d at 564 n.3; *Perry v. Colvin*, No. 2:15cv1145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016) (citing *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)). Generally, a reviewing court will affirm the ALJ's RFC findings when she considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and her decision built an "accurate and logical bridge from that evidence to [her] conclusion[s]," *Woods*, 888 F.3d at 694. *See Thomas*, 916 F.3d at 311–12. ALJ Edwards's reasoning does not meet the second requirement.

First, Dawn saw multiple medical providers at least weekly for her mental impairments. She did miss many other medical appointments for a variety of reasons, including lack of funds to pay for services, moving to another state, and substance use relapse. Nevertheless, the record shows that she consistently attended treatment for her mental impairments. *See Lewis*, 858 F.3d at 869 ("ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding."). Additionally, although Suboxone has clearly helped Dawn with her opioid addiction, her many symptoms have persisted despite regular medication adjustments. The ALJ's conclusion does not acknowledge that "symptoms of mental illness may wax and wane over the course of treatment," *Testamark*, 736 F. App'x. at 398.

ALJ Edwards noted that Dawn testified she had been sober since 2012, but she told a treatment provider she had been sober since 2018. An examination of the record shows that Dawn consistently referred to being "sober" since 2012, but she also acknowledged having relapses, including in 2018. Such "trivial inconsistencies," *Testamark*, 736 F. App'x at 399, do not in and of themselves provide a valid reason to doubt a claimant's symptoms.

Finally, ALJ Edwards cited Dawn's testimony that she "showers daily, does some cleaning, and goes to medical appointments," and found that those activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." R. 22. Those activities are extremely limited. *See, e.g.*, *Hines*, 453 F.3d at 565–66. Moreover, the ALJ "did not acknowledge the limited extent of those activities as described by [Dawn] or explain how those activities showed that [Dawn] could sustain a full-time job" outside the home. *Brown*, 873 F.3d at 269. "An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them. The ALJ here did just that." *Woods*, 888 F.3d at 694.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 22; **REVERSE** the Commissioner's final decision denying Dawn's DIB claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or

specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 15, 2023

Joel C. Hoppe
United States Magistrate Judge